**BUFFALO FORGE COMPANY, Ampco-Pittsburgh Corporation, and Ampco-Pittsburgh Securities II Corporation, Plaintiffs,**

v.

**OGDEN CORPORATION, David R. Newcomb, Raymond J. Popp, Thomas W. Burke, Edward W. Duffy, John H. Gregory, and Frederick S. Pierce, Defendants.**

No. CIV–81–29C.

United States District Court, W.D. New York.

Jan. 27, 1983.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Jay Topkis, New York City, of counsel), and Moot & Sprague, Buffalo, N.Y., for plaintiffs.

Sullivan & Cromwell, New York City (David Tulchin, and John Warden, New York City, of counsel), and Offerman, Fallon, Mahoney & Cassano, Buffalo, N.Y., for defendant Ogden Corp.

Skadden, Arps, Slate, Meagher & Flom, New York City (Vaughn C. Williams, New York City, of counsel), for individual defendants.

CURTIN, Chief Judge.

I. *Introduction*

This action was commenced in January 1981 with a request for injunctive relief by the Buffalo Forge Company [Buffalo Forge]. Plaintiff charged the Ampco-Pittsburgh Corporation [Ampco] with violations of various federal securities, antitrust, and banking laws. The charges arose within the context of an attempt by Ampco to purchase all Buffalo Forge stock at a price of $25 per share.

The request for an injunction was denied on January 26, 1981, on the ground that Buffalo Forge did not demonstrate sufficient preliminary proof to warrant the issuance of an injunction. This decision was affirmed by the United States Court of Appeals for the Second Circuit. *Buffalo Forge Co. v. Ampco-Pittsburgh Corp.*, 638 F.2d 568 (2d Cir.1981).

Throughout these proceedings, Buffalo Forge resisted Ampco's proposed acquisition and rejected the stated price per share. Buffalo Forge searched for an alternate buyer for its stock. On February 9, 1981, Buffalo Forge entered into a merger agreement with a "white knight," Ogden Corporation [Ogden].

As part of this agreement Ogden purchased 425,000 of Buffalo Forge treasury shares at $32.75 per share. Ogden paid these shares with a promissory note, payable over 10 years with an annual interest rate of 9 percent. The agreement also granted Ogden a one-year option to acquire an additional 143,400 treasury shares, again for the price of $32.75 per share.

The merger agreement was announced to the public the same day. A flurry of bidding activity followed the announcement. On February 10, Ampco increased its offer from $25 to $34 per share. Ogden then moved by making a cash tender offer of $37 per share for 850,000 shares, to be followed by a tax-free share-for-share merger with Buffalo Forge. Ampco responded by increasing its offer to $37.50 per share, whereupon Ogden withdrew from the bidding war.

Ampco thus acquired control over Buffalo Forge. On March 9, Ogden tendered its 425,000 shares of Buffalo Forge stock. Ampco refused to pay for the shares. The Buffalo Forge Board of Directors had declared a 27 ½ cent dividend per share on March 5. The dividend was not paid to Ogden. In January 1982, Ampco had refused to let Ogden exercise its option to purchase the additional shares of stock. Ampco stated that it would not pay for any stock, nor would it pay the dividend until after a judicial determination regarding the validity of the purchase of the shares. These are the actions underlying this dispute.

In June 1981, after it acquired control over Buffalo Forge, Ampco moved to amend its complaint to delete certain of the claims, primarily those asserted under the federal securities laws, and to realign the parties. The motion was granted, and Ampco was given leave to prosecute the claims against the former directors in the name of Buffalo Forge and the Ampco-Pittsburgh Securities II Corporation (the entity organized by Ampco for the purpose of facilitating the takeover). For purposes of simplification, the plaintiffs shall be referred to as "Ampco."

Basically, Ampco seeks rescission of the sale of the treasury stock and the option to purchase made to Ogden by the former

members of the Buffalo Forge Board of Directors. Plaintiffs charge the former members, David R. Newcomb, Raymond J. Popp, Thomas W. Burke, Edward W. Duffy, John A. Gregory, and Frederick S. Pierce (collectively referred to as the individual defendants) with breach of their fiduciary duties to the corporation and with waste of the business assets of Buffalo Forge. Ampco has set forth a number of grounds upon which its claims are based. Ampco alleges that the individual defendants were primarily motivated by their own interest in avoiding a taxable sale of their stock because some of the directors held sizeable quantities of stock at low tax bases. This caused the directors, according to the plaintiffs, to seek out a tax-free, share-for-share exchange, like that offered by Ogden, and reject other tender offers.

In addition, Ampco claims that the failure of the individual defendants and Newcomb, in particular, to negotiate directly with Ampco to obtain a better offer was a breach of their fiduciary duty. Also, that the sale of the 425,000 treasury shares and the purchase option given in exchange for a ten-year, 9 percent promissory note was a "tip" to Ogden, and the contract was entered into in an attempt to stifle bidding competition.

Claiming that Ogden conspired with the individual defendants, with Newcomb, in particular, and their agents, Ampco seeks rescission of the sale of the stock. In the alternative, Ampco seeks damages from the individual defendants.

The defendants have denied any impropriety in the negotiations or in the contract for the sale of the stock. The individual defendants claim that they were acting as reasonable directors at all times and exercised their best business judgment. They contend that their actions were undertaken, in part, upon the professional advice of investment bankers and lawyers and are protected by operation of the provisions of the New York Business Corporation Law §§ 504, 717.

Ogden has filed several counterclaims seeking payment for the 425,000 shares of stock, plus the 143,400 shares available to Ogden under the purchase-option clause of the merger agreement. In its capacity as a shareholder, Ogden demands payment of the dividend of 27 ½ cents per share, declared by the Board of Directors on March 5, 1981, and payable on March 31, 1981.

In addition, Ogden claims that Ampco's refusal to pay for the 425,000 shares on the same basis as was afforded other tendering shareholders constitutes a manipulative practice in violation of the New York Security Takeover Disclosure Act, New York Business Corporation Law §§ 1600 *et seq.* and its accompanying regulations. Ogden charges Ampco with violations of the provisions of Article 8 of the New York Uniform Commercial Code and various provisions of the Business Corporation Law. Ogden seeks payment with interest at the prime rate.

The case was set for trial after the amended pleadings were filed. In a supplemental memorandum of law submitted in December 1981 and a pretrial conference held on January 6, 1982, the plaintiffs moved again to amend their complaint to state a claim of violation of the federal securities laws. Ampco set forth its argument that the sale of the stock, plus an option to purchase given to one of two competing tender offerors, constituted a "manipulative device" within the meaning of section 14(e) of the Williams Act, 15 U.S.C. § 78n(e), and that the plaintiffs are entitled to rescission of the contract pursuant to 15 U.S.C. § 78cc(b).

Trial on all of these issues was held on January 26, 27, and 28, 1982. Prior to trial, the parties filed a joint stipulation of facts. These stipulations are accepted and made a part of the court's decision. After review of the trial transcripts and memoranda of law, and after examination of the exhibits produced at trial, the court makes the following findings of fact and conclusions of law.

## II. Parties

Buffalo Forge Company is a New York corporation, with its principal place of busi-

ness at 490 Broadway Street, Buffalo, New York. Since July 14, 1981, Buffalo Forge has been an indirect, wholly owned subsidiary of Ampco-Pittsburgh Corporation, which is a Pennsylvania corporation, with its principal place of business at 700 Porter Building, Pittsburgh, Pennsylvania. Also involved is Ampco-Pittsburgh Securities II Corporation [A–P II], a wholly owned subsidiary of Ampco, a Delaware corporation, with its principal place of business at 2625 Concord Pike, Wilmington, Delaware. The remaining corporate party is the Ogden Corporation, a Delaware corporation, with its principal place of business at 277 Park Avenue, New York, New York.

Chief amongst the individual litigants is David R. Newcomb who was, until March 30, 1981, President, Chief Executive Officer, and a director of Buffalo Forge. He is currently President of Buffalo Forge and a director of Ampco. Raymond J. Popp, Thomas W. Burke, Edward W. Duffy, John A. Gregory, and Frederick S. Pierce were directors of Buffalo Forge at all times from January 2, 1981, to March 30, 1981. During the time period under question, it is undisputed that the directors held the following shares of Buffalo Forge stock:

| | |
|---|---|
| Newcomb | 24,054 |
| Popp | 8,974 |
| Burke | 1,000 |
| Duffy | 200 |
| Gregory | 22,700 |
| Pierce | 72,745 |

All of the directors' stock was held at tax bases below $25 per share.

### III. Findings of Fact

On Friday, January 2, 1981, Marshall Berkman, [Berkman], Chairman of Ampco, telephoned Newcomb to inform him that Ampco was about to announce its intention to make a $25 per share tender offer for Buffalo Forge shares. There had been no prior contact between Ampco and Buffalo Forge. That same day, Ampco issued a press release to announce its proposed $25 offer.

The proposed acquisition was communicated by Newcomb to the remaining members of the Buffalo Forge Board of Directors. Newcomb also contacted Buffalo Forge's financial advisor, Kidder, Peabody & Co. [Kidder], its lawyers, Skadden, Arps, Slate, Meagher & Flom [Skadden Arps], and Lord, Day & Lord [Lord Day] to inform them of Ampco's offer. The Board decided to take no action until Ampco's offer was formally commenced.

On January 7, 1981, Ampco formally commenced its tender offer for any and all shares of Buffalo Forge at a price of $25 per share. The expiration date of the offer was February 3, 1981. Acceptance of the offer by any shareholder would have resulted in the recognition of gain for tax purposes to the extent that $25 exceeded such shareholder's tax basis for such shares.

On that same day, January 7, 1981, Kidder submitted a new agreement to Newcomb, which he signed on January 8 after consulting with legal counsel. The agreement provided that Kidder was specifically retained to advise Buffalo Forge with respect to Ampco's offer and any other proposals, offers, or indications of interest concerning the sale or acquisition of Buffalo Forge's stock or assets over the next 18 months. The agreement contained standard provisions and called for Buffalo Forge to pay Kidder a fee of $150,000.00, plus an additional fee of 6 percent of the amount by which the aggregate value of any acquisition of Buffalo Forge exceeded $25 per share acquired. If at least 80 percent of Buffalo Forge's stock was tendered in such a transaction, the additional fee was payable on 100 percent of the shares.

Before signing the retainer agreement, Newcomb consulted with counsel for Buffalo Forge and was advised that the terms of the retainer agreement were ordinary and fair.

The Buffalo Forge Board met to consider Ampco's offer on January 8, 1981. At that meeting, Kidder rendered its written opinion that Ampco's offer of $25 cash per share of Buffalo Forge was "inadequate." Kidder also advised the Board that it should be possible to obtain a significantly higher offer than $25 per share. Also at the January

8 Board meeting, representatives of Skadden Arps and Lord Day reviewed the legal implications of Ampco's offer, including the directors' fiduciary responsibilities. The directors of Buffalo Forge determined unanimously that Ampco's offer was "inadequate and not in the best interests" of Buffalo Forge and its shareholders and unanimously resolved to recommend to the shareholders that they reject the offer.

The Board passed a resolution authorizing the appropriate officers and the investment bankers and legal counsel of the company

to explore and investigate certain types of possible transactions including, without limitation, the acquisition by the Company of all or part of the business of another company, the issuance or sale publicly or privately of equity or other securities of the Company, through acquisition of shares, the acquisition of the Company (or one or more of its businesses) by another Company, and joint ventures between the Company and other companies . . . ."

The Board also authorized the commencement of litigation against Ampco.

On January 9, 1981, the Buffalo Forge Board issued a press release and sent a letter to Buffalo Forge shareholders urging them to reject Ampco's offer.

Newcomb was authorized by the Board to seek out alternatives to Ampco's $25-per-share offer. As stated above, Buffalo Forge commenced this lawsuit against Ampco on January 9, 1981. On January 12, 1981, Buffalo Forge filed a request for a public hearing with the New York State Attorney General pursuant to the New York Security Takeover Disclosure Act.

Ampco's offer was originally scheduled to expire on February 3, 1981. On January 27, 1981, the New York State Attorney General issued an order staying Ampco's purchase of shares to maintain the status quo pending the completion of his investigation. On February 2, 1981, the Attorney General issued a further order requiring certain disclosures and continuing the stay pending compliance with the disclosure order. On February 3, 1981, Ampco made the required disclosures by amendment of the registration statement previously filed with the Attorney General. On February 5, 1981, the Attorney General lifted the prohibition on Ampco's purchase of shares, effective at midnight on the fourth day after the mailing of the disclosures to Buffalo Forge's shareholders.

On January 23, 1981, the Buffalo Forge Board, on the recommendation of Newcomb, approved a proposal for the corporation to enter into employment agreements with key employees on terms to be negotiated by Newcomb. Such contracts with seven vice presidents were signed on February 20, 1981, effective as of January 31, 1981. Furthermore, on January 23, 1981, the Buffalo Forge Board unanimously approved the signing of a retainer agreement with the law firm of McGrath, Meyer, Lieberman & Lipp.

After the January 8 meeting of the Board, Newcomb undertook a search for alternative tender offers. After consulting with the investment bankers, Newcomb decided not to negotiate directly with Ampco to attempt to obtain an increase in Ampco's stated offer. This advice was based on Kidder's experience in unsolicited tender offer situations, which had shown that the offeror is unlikely to increase its bid substantially in the absence of a competing bid. Kidder also expressed its belief that, in light of its prior dealings with the Berkman family (which controlled Ampco), Ampco was not likely to raise its offering price. Kidder prepared a report about Buffalo Forge for distribution to interested companies.

As noted above, Ampco was free to purchase shares as of February 5, 1981, pursuant to the order of the Attorney General. With this deadline in mind, Newcomb and Kidder contacted numerous companies to determine whether they were interested in making a tender offer. The members of the Board of Directors were aware of these negotiations.

Among the companies contacted by Newcomb and Kidder were: Central New Jersey Industries; Interpace Corporation; I.C. Industries; Thomas Tilling; Kuhnle, Kopp & Kausch of West Germany [KKK]; and Bass Brothers of Houston. These were the companies which, in addition to Ogden, expressed the strongest interest in acquiring Buffalo Forge. Newcomb and Kidder discussed the possibility of acquisition with numerous other companies as well. After initial discussions, Central New Jersey Industries concluded that it was without adequate financial resources to make an acceptable offer and withdrew from the arena of potential bidders.

Newcomb traveled to West Germany to meet with KKK. He discussed with KKK the possibility of the purchase of all of the Buffalo Forge treasury stock for a price of at least $25 per share in cash. The talks did not result in a tender offer. At about the same time, Kidder discussed the possibility of the sale of Buffalo Forge treasury stock to Bass Brothers of Houston, also without success.

Two companies, in addition to Ogden and Ampco, made offers to Buffalo Forge. These offers came after negotiations with Ogden had begun.

One of the companies that made an offer to Buffalo Forge was Thomas Tilling, Inc. [Tilling], a British company. Representatives of Tilling visited Buffalo Forge during the week of January 26. On February 5 and 6, Tilling told Douglas Brown of Kidder that, subject to its Board's approval, Tilling was prepared to make a cash tender offer at $30 per share, not conditioned on the sale of any treasury stock.

Tilling was not able to make a firm offer to Buffalo Forge at that time, however, because its Board would not meet in the United Kingdom until February 9 or 10. Those dates would have been subsequent to Ampco's completed tender offer. Mr. Collin Draper, Chief Executive Officer of Tilling's United States operations, assured Mr. Brown that he would recommend the acquisition to the Board and that he was confident that the Board would accept his recommendation. Tilling was not in a position to make a tax-free offer, because it was not a United States company. Mr. Brown told Tilling's representatives that a $30 bid would probably not be successful in any event. Tilling never made any firm offer.

The only other offer was made by I.C. Industries [ICI]. On February 4, 1981, after meetings that had begun during the week of January 19, 1981, ICI made a written offer to make a $30-per-share cash tender offer for Buffalo Forge.

This ICI proposal had three conditions. First, ICI required that Buffalo Forge give ICI an option to purchase Buffalo Forge's treasury stock. Second, ICI required that Buffalo Forge obtain agreements from Buffalo Forge's largest shareholders that they would tender their shares to ICI. ICI's offer also would have been a taxable transaction to Buffalo Forge shareholders. Finally, ICI's proposal was conditioned upon a response by Buffalo Forge by 10 a.m. on February 5.

After receipt of the ICI offer, Buffalo Forge's lawyers met with ICI's lawyers on February 4 and 5 to attempt to negotiate a better offer. Buffalo Forge received ICI's offer and Ogden's offer on the same day. Newcomb did not call a Board meeting to consider ICI's proposal before it had expired, although he was authorized to call a telephone conference call meeting.

ICI's offer expired by its terms on February 5, 1981. Thereafter, ICI's Chairman sent a telegram to ICI's Board members, stating:

Ogden Corporation and Buffalo Forge have signed a merger agreement for a tax free exchange said to be worth $32.75 per Buffalo Forge share. There are no regrets here. We feel our price was about right and are pleased not to have stretched to the point where our shareholder earnings would have been substantially diluted for this particular objective.

Buffalo Forge was then left with Ogden's offer, and this court must now address the controversy centered on the validity and propriety of the merger agreement between Ogden and Buffalo Forge.

Ogden's interest in Buffalo Forge was not the result of Kidder's effort. Ogden's Chairman, Ralph Ablon, read about Ampco's tender offer and, on January 21, called Newcomb to say that Ogden might have an interest in Buffalo Forge. This led to preliminary meetings in New York City on January 30 and in Buffalo on February 2 attended by Newcomb, Brown of Kidder, Ablon, Donald Krenz (Ogden's Vice President and chief counsel), and other Buffalo Forge and Ogden executives.

Kidder, and lawyers from Skadden Arps and Lord Day conducted the negotiations on behalf of Buffalo Forge. Newcomb did not participate directly in the negotiations. He remained in Buffalo, where he was in frequent telephone contact with the participants in the meetings.

Krenz had primary responsibility for the negotiations on behalf of Ogden. Krenz's first proposals involved a 6:7 exchange (6 shares of Ogden stock for 7 shares of Buffalo Forge stock) for either Ogden convertible preferred or common stock.

This new issue of convertible preferred stock was to be priced by Ogden in the $28 to $29 range. The new issue of Ogden common stock had a value to Buffalo Forge shareholders of approximately $28.07 per share. Brown told Krenz that the 6:7 exchange ratio was too low and suggested a share-for-share exchange.

On February 4, 1981, Ogden proposed a merger agreement which consisted of the following elements:

(1) an exchange of Ogden common stock for Buffalo Forge common stock at a ratio of one-for-one, in the context of a tax-free merger between the two companies;

(2) an option for Ogden to purchase 395,000 treasury shares of Buffalo Forge at $32.75 (the then-current price of Ogden's shares) per share, either in cash or with a promissory note maturing in nine months and bearing interest at the prime rate;

(3) the possibility for Buffalo Forge to purchase up to 500,000 shares of its own stock from its shareholders at a price not to exceed $32.75 per share;

(4) delivery by Buffalo Forge to Ogden of an option from holders of 25 percent of Buffalo Forge's common stock, agreeing to sell to Ogden at the merger price;

(5) $1 million liquidated damages if the deal were not consummated.

In raising the proposed exchange ratio from 6:7 to 1:1, Ogden increased the consideration each shareholder of Buffalo Forge would receive—and the total cost to Ogden—by 16 percent. Since Ogden's stock was then trading at $32.75 per share, the proposal represented a face value increase of 31 percent over Ampco's $25 offering price, and it was almost 10 percent higher than the offer made by ICI.

Ogden's Chairman, Ablon, called Newcomb on February 4 to inform him of Ogden's proposal. On the morning of February 5, Krenz and Ablon separately called Newcomb to describe Ogden's proposal in more detail. They both emphasized that an option on Buffalo Forge's treasury shares was an essential feature of that proposal. Ablon assured Newcomb that if Ogden acquired the treasury shares and an Ogden-Buffalo Forge merger were not consummated, Ogden would not dispose of the treasury shares without Buffalo Forge's approval.

In the negotiations between Ogden and Buffalo Forge, which took place on August 4, 5, and 6, and concluded in the Agreement and Plan of Reorganization (the "Merger Agreement"), Ogden was forced by Buffalo Forge to make concessions on many of the original elements of the proposed agreement.

Specifically, the Buffalo Forge negotiators told Ogden that the demand for $1 million in liquidated damages was unacceptable, and Ogden dropped this demand.

Ogden withdrew its request for shareholder commitment from the shareholders of 25 percent of the Buffalo Forge stock upon being informed that Buffalo Forge would not be able to obtain such a commitment. Ogden settled, instead, for a statement by the directors (who collectively held about 6 percent of the stock) that they

would vote their shares in favor of the Ogden proposal.

Another significant concession made by Ogden during the negotiations concerned the Buffalo Forge self-tender. Ogden's proposals were made in the form of stock exchange transactions, because Ogden wished to use its stock and not to make any cash contribution to any merger. Kidder, on the other hand, pressed to have Ogden provide some cash alternative for Buffalo Forge shareholders who might prefer to receive cash. Ogden was ultimately persuaded by Kidder to make a cash tender offer for up to 500,000 Buffalo Forge shares, at a price up to $32.75 per share, if any other party made a cash tender offer for Buffalo Forge shares at a price of $29 or more.

Because Buffalo Forge's lawyers were concerned that such a contingent tender offer might violate certain technical requirements of an applicable Securities and Exchange Commission rule, it was ultimately agreed that this contingent tender offer would instead be made by Buffalo Forge (to whom the Securities and Exchange Commission rule did not apply) and that Buffalo Forge would have the right to resell or "put" those shares to Ogden at the cash price paid by Buffalo Forge, plus the amount of any carrying costs incurred by Buffalo Forge. By this agreement, Ogden added a cash contribution of up to $16,375,-000.00 to its proposal.

At the outset of negotiations, Ogden sought to negotiate only an agreement in principle and then to obtain the Board's approval and execute a merger agreement at some time after the expected termination of Ampco's $25 offer. Kidder, on the other hand, considered it important to have a firm merger agreement before it could recommend that Buffalo Forge accept the Ogden offer. Ultimately, Ogden agreed to have an immediate Board meeting and to enter into a formal merger agreement prior to the expected termination of Ampco's $25 tender offer.

From the beginning of negotiations, Ogden had also demanded, as a condition to making any offer, that it be granted an option to purchase Buffalo Forge's 568,400 shares of treasury stock. When Ogden first contemplated an offer for Buffalo Forge, Ogden considered purchasing the Buffalo Forge treasury stock for either cash or a short-term promissory note bearing interest at the prime rate. However, this specific proposal was never communicated to Buffalo Forge. After making what it considered to be significant concessions with regard to the terms of its proposed merger agreement, Ogden was not willing to pay cash for the treasury shares. Ogden instead insisted upon, and made the deal conditional upon, a sale of 425,000 treasury shares for a 10-year, 9 percent note at $32.75 face value, and a one-year option to purchase the remaining 143,400 treasury shares on similar terms.

Kidder attempted to negotiate more attractive terms for the promissory note, asking for cash and a higher interest rate with a shorter term. Ogden rejected these suggestions. Kidder also asked for amortization on the note, which was rejected, and for a cross-default provision, which Krenz agreed to include, with a limitation on its applicability to a default in $60 million of funded debt.

The sale of the treasury shares and the grant of the option for the additional 143,-400 treasury shares on the negotiated terms were a precondition to Ogden's agreement to enter into the merger agreement, with Buffalo Forge as an integral part of the merger package.

Newcomb and Kidder concluded that the total $32.75 Ogden merger proposal was the best offer available to Buffalo Forge within the time period dictated by Ampco's pending $25 offer. Newcomb decided to recommend the offer to the Buffalo Forge Board.

On February 7, 1981, a special Buffalo Forge Board meeting was held to consider the Ogden offer. Prior to this meeting, the Individual Defendants had received and reviewed materials about Ogden. All except Edward Duffy attended. Mr. Duffy communicated by conference call. Representatives from Kidder, Skadden Arps, and Lord

Day also attended. They reviewed the activities that Newcomb and Kidder had undertaken to explore alternative transactions to the Ampco tender offer. They specifically weighed ICI's $30 tender offer proposal.

Both Ogden and the Buffalo Forge directors were advised by legal counsel experienced in takeover matters that the transaction, including the sale of the treasury shares and grant of the option for the promissory note, was legal, valid, and proper. The Buffalo Forge directors were advised by their lawyers that acceptance of the Ogden proposal would be consistent with their fiduciary responsibilities to the Buffalo Forge shareholders. Representatives from Kidder advised the Board that the Ogden transaction, including the sale of the treasury shares, was "fair and adequate." Kidder also advised the Board that Ogden's was the best proposal available to the company at that time.

The Individual Defendants discussed various aspects of the Ogden offer. Pierce inquired about the strength of Ogden's management. Burke commented favorably on Ogden's marine operations, with which he was familiar. Duffy inquired about the present value of the promissory note Buffalo Forge would receive from Ogden in partial consideration for the treasury stock. Kidder responded that the note had a present value of approximately $25–$26 per share of Buffalo Forge stock. (Kidder had previously calculated the note's present value during the negotiations with Ogden.) Kidder's $26 valuation was an amount in excess of the book value of Buffalo Forge's common stock (which was $20.05) and in excess of the normal trading price of Buffalo Forge stock. As Duffy later calculated, this value was also in excess of Buffalo Forge's average cost of $13.20 for purchasing the treasury stock.

Each director understood that Ogden intended to put its own designees on the Buffalo Forge Board upon consummation of the merger. Following their discussion, the Individual Defendants unanimously approved the merger agreement "as in the best interests of the Company and its share-

holders." They also approved the sale and option of treasury shares, resolving:

that in the judgment of the Board of Directors of the Company the consideration to be received from Ogden for the 425,000 shares of the Company's treasury stock and for the additional 143,400 shares of the Company's treasury stock subject to the Option is fair, adequate and sufficient consideration for the sale and purchase of such stock and the sale of such stock and grant of the Option is necessary and desirable in order to obtain for the Company and its shareholders the benefits of the merger contemplated by the Agreement and Plan of Reorganization.

On February 8, the Ogden Board of Directors approved the merger agreement. The merger agreement was executed on February 9; Ogden purchased the 425,000 treasury shares also on February 9. The transaction was announced publicly the same day.

On February 10, 1981, Ampco announced that it would raise its bid to $34 cash per share of Buffalo Forge stock. On February 11, Ampco formally revised its bid to incorporate the increase, and it simultaneously declared that it would refuse to pay for any shares tendered by Ogden until the validity of the sale of Buffalo Forge treasury stock to Ogden had been judicially determined.

Also on February 11, 1981, Ampco commenced litigation against both Buffalo Forge and Ogden in the United States District Court for the Southern District of New York on causes of action alleged to arise under sections 14(d) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n(d) and 78n(e), and the rules and regulations promulgated thereunder by the Securities and Exchange Commission. Ampco sought injunctive relief against the Ogden offer and the Ogden-Buffalo Forge merger. The gist of the complaint was that Buffalo Forge had failed to make certain disclosures required by the securities laws and had attempted to inflate the market price of its stock.

On February 11, 1981, Ampco commenced litigation in Supreme Court, New York County, against Buffalo Forge and its directors, claiming that the directors had breached their fiduciary duty by the sale of the treasury shares. Ampco sought rescission of the sale. Both this action and the action described in the preceding paragraph were transferred by consent of all parties to this court to be deemed counterclaims in this action.

As a result of discussions between Buffalo Forge and Ogden, Ogden revised its offer in light of Ampco's higher bid. Ogden agreed to make a cash tender offer for 850,000 Buffalo Forge shares at $37 cash, after which the proposed share-for-share merger would be submitted to the remaining Buffalo Forge shareholders.

Buffalo Forge and Ogden announced the amendment of the merger agreement on February 20, and Ogden commenced its tender offer on February 25. On February 28, Ampco raised its offer again to $37.50 for any and all shares. As noted above, Ampco also announced that it would refuse to pay for any shares tendered by Ogden until a judicial determination of the validity of the stock transfer had been made.

Following Ampco's announcement of its $37.50 offer, Kidder and Newcomb sought to determine whether any higher offer might be made by Ogden or any third party. They determined that none was available, and on March 5, 1981, the Individual Defendants unanimously recommended that Buffalo Forge shareholders tender their shares to Ampco at the $37.50 price. On that same day, this court denied Ampco's and Buffalo Forge's requests for preliminary injunctive relief. Thereafter, on March 9, 1981, Ogden withdrew its pending tender offer, and certain obligations under the merger agreement were terminated by mutual consent. As a result, Ampco discontinued its federal securities law claims as moot and pursued its rescission claim against Ogden and the directors, solely under the state law theory that the directors had breached their fiduciary duties.

On March 5, 1981, the Buffalo Forge Board declared a dividend of 27 ½ cents per share, payable March 31, 1981, to holders of record of Buffalo Forge common stock as of March 17, 1981. Ogden was a holder of record of 425,000 shares on that date.

Ampco's Chairman, Marshall Berkman, caused Buffalo Forge not to pay Ogden the dividend declared on March 5, 1981. All other shareholders of record as of March 17, 1981, received such dividend. Ampco sought and obtained the resignation of all of Buffalo Forge's directors, but for Newcomb, who was given a place on Ampco's Board. On July 14, Ampco caused one of its wholly owned subsidiaries (Ampco-Pittsburgh Securities VI Corporation) to be merged into Buffalo Forge.

On January 5, 1982, Ogden notified Buffalo Forge that it was exercising its option to purchase 143,400 treasury shares, enclosed a 9-year, 9 percent note, and sought $37.50 cash per share. By letter dated January 8, 1982, Buffalo Forge refused to pay for the option shares, pending judicial resolution of the validity of the treasury share sale and option.

## IV. Conclusions of Law

 As the United States Court of Appeals for the Second Circuit has held, the "business judgment rule" is applicable to actions undertaken within the context of bidding wars and other contests for control of a corporation. *See Treadway Co. v. Care Corp.,* 638 F.2d 357 (2d Cir.1980); *Crouse-Hinds Co. v. Inter North, Inc.,* 634 F.2d 690 (2d Cir.1980); *Auerbach v. Bennett,* 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979).

> The business judgment doctrine:
> bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes.

*Auerbach v. Bennett, supra* at 629, 419 N.Y. S.2d 920, 393 N.E.2d 994. Absent proof of self-interest or bad faith on the part of the directors, therefore, the court may not second-guess the decisions of the directors.

■ The record shows that Ampco has failed to rebut the presumption that the actions of the directors were undertaken in good faith.

■ The record does not show that Newcomb or any of the directors were motivated to oppose Ampco's tender offer and accept Ogden's offer due to self-interest. Each director unequivocally denied that his personal tax considerations influenced his decision. Moreover, at least three of the six directors of Buffalo Forge could not have possibly been so motivated. Edward Duffy, the Chief Executive Officer of Marine Midland Bank, and Thomas Burke, the Chief Executive Officer of American Steamship Company, each held but a nominal number of shares, and under Canadian law, it was to the advantage of John Gregory, a Canadian citizen, to accept a cash offer rather than an exchange of stock. Finally, the Board as a whole cannot be charged with having acted from self-interest where less than a majority are found to have done so. *See Treadway, supra,* 638 F.2d at 383.

The record shows that the Individual Defendants voted for the Ogden $32.75 offer because it was the best offer available— even without respect to its tax-free feature. The tax-free feature of Ogden's offer was an additional benefit available to all Buffalo Forge shareholders. Buffalo Forge shareholders surveyed in December 1980 reported an average tax base for their stock of "more than $10.00." This evidence supports the reasonableness of the Individual Defendants' view that many Buffalo Forge shareholders had a low enough tax base to benefit from a tax-free transaction.

The directors did not violate their fiduciary duties during the negotiating process. Ampco's contention that the retainer agreement between Buffalo Forge and Kidder created a "conflict of interest" on Kidder's part is without support in the record. The agreement was signed only after Newcomb received the assurance of legal counsel that such a retainer agreement was proper. Pursuant to New York Business Corporation Law § 717, Newcomb was entitled to rely upon the representations of counsel.

Moreover, the retainer agreement could not influence Kidder to try to prevent a takeover by Ampco. Under the agreement, Kidder's contingent fee would be increased as a result of any successful bid at a price higher than $25 per share.

■■ Similarly, Ampco may not object to the decision to have Buffalo Forge's agents do much of the actual negotiation (subject always to Newcomb's control and the Board's approval). The directors considered Kidder and the attorneys from Skadden Arps, in particular, to be better equipped for such negotiations. The attorneys and Kidder were experienced in merger and acquisition transactions and could lend a professional expertise to the negotiations that the Individual Defendants, acting alone, could not. It was certainly a reasonable business practice to authorize Kidder and the attorneys to negotiate in those circumstances. And, again, pursuant to Business Corporation Law § 717, the directors were entitled to rely upon these agents. Reliance upon the attorney's advice, even when unsound, is not a breach of fiduciary duty. *Tannenbaum v. Zeller,* 399 F.Supp. 945, 955 (S.D.N.Y.1975), *aff'd in part and rev'd on other grounds,* 552 F.2d 402 (2d Cir.1977), *cert. denied,* 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977).

At no point during these negotiations did Ogden become aware of any facts that led or should have led it to believe that the Buffalo Forge negotiators or directors were acting out of self-interest or in breach of their duty to obtain the best possible offer for Buffalo Forge shareholders. Instead, the Buffalo Forge negotiators drove a hard bargain in arm's length negotiations and demanded and received significant concessions on many points.

The sale of the treasury stock was valid and proper. It was negotiated as part of the total Ogden merger proposal and in exchange for receipt of the $32.75 merger proposal.

The terms of the promissory note given for the treasury shares were negotiated at arm's length between Ogden and Buffalo

Forge. The record shows that the Individual Defendants were advised by Kidder that the promissory note had a present value of approximate $26 per share of treasury stock and that the Individual Defendants reasonably relied on that valuation. They sold the treasury stock at a price that exceeded the book value of the shares, the normal trading price of the shares, and the cost to Buffalo Forge of the shares.

At trial, two witnesses valued the Ogden promissory note at amounts less than the $26 Kidder valuation (Ampco's expert— $9,136,300.00, or $21.50 per share, and the Individual ,Defendants' expert—$24.46 per share). Ampco's trial expert conceded that such valuations are not an exact science and that he would not criticize other reasonable but higher valuations.

Both of these valuations support the conclusion that the Individual Defendants acted reasonably in relying on the Kidder valuation of the Ogden promissory note. They also reflect that the Individual Defendants acted reasonably in accepting the promissory note as part of the consideration contained in the Ogden merger proposal. All of the above valuations show that the note had a value that exceeded the book value of the shares, their cost to Buffalo Forge, and their normal trading price prior to Ampco's announcement of its tender offer for Buffalo Forge.

Moreover, despite the plaintiffs' contentions that the note is valueless because it is unmarketable, it is clear that the sale of the treasury shares brought a valuable income-producing asset—the Ogden note—into Buffalo Forge's treasury.

 Finally, pursuant to New York Business Corporation Law § 504(e), the directors were entitled to fix the consideration to be received for the treasury shares. Pursuant to New York Corporation Law § 505(h), the directors' judgment as to the adequacy of the consideration received for the grant of the option was conclusive, absent fraud, of which there is no evidence.

 Furthermore, with respect to New York Business Corporation Law § 717, the directors were entitled to rely on the advice of Kidder that the transaction with Ogden, including the sale of the treasury shares and grant of the option, was fair to the corporation and, on the advice of Skadden Arps and Lord Day, that the transaction was legal, valid, and proper and in compliance with the directors' fiduciary responsibilities.

 Ogden purchased the treasury shares in good faith for value and without notice of any adverse claim. Ogden is thus entitled to the status of a bona fide purchaser of the treasury shares, New York Uniform Commercial Code §§ 8–301, 8–304, and is entitled to payment for the shares.

 The Ogden-Buffalo Forge transaction, pursuant to which Ogden acquired the treasury shares, was not in any event a manipulative practice forbidden by section 14(e) of the 1934 Act. The record shows that neither Ogden nor Buffalo Forge intended the sale of the treasury shares and grant of the option to foreclose additional bidding, either by Ampco or by third parties.

 Contrary to Ampco's argument that the sale of the stock and the grant of the option constituted an unlawful attempt to circumvent the requirement that two-thirds of Buffalo Forge's shareholders approve a merger between Buffalo Forge and Ogden, the court finds that the Merger Agreement was not, in itself, a plan of merger which required shareholder approval but was a contract to create a merger plan. The merger agreement contemplated preparation of a "plan of merger," which was thereafter to be submitted to the shareholders for a vote (see New York Business Corporation Law §§ 902, 903(a)), but neither the merger agreement nor the related transactions to which it referred (such as the treasury stock sale) were a "plan of merger" which, by law, must be submitted for shareholder approval, and New York law does not require shareholder approval of a sale of treasury shares.

Similarly, there is no evidence that the Individual Defendants sold the treasury

stock to influence the shareholder vote on the Ogden merger proposal. They sold the treasury stock because it was a necessary prerequisite to obtaining Ogden's $32.75 offer.

■ The court also rejects plaintiffs' antitrust claims. Neither an agreement to purchase stock nor an agreement to terms of merger is an agreement to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

■ Finally, the court finds that the sale of the treasury shares does not constitute a violation of section 14(e) of the Williams Act, 15 U.S.C. § 78n(e). The actions in dispute in the case at bar simply do not constitute the kind of manipulative, "lockup" device found to be unlawful by the United States Court of Appeals for the Sixth Circuit in the case of *Mobil Corp. v. Marathon Oil Co.,* 669 F.2d 366 (6th Cir. 1981).

In *Mobil,* the court found that an option for the sale of certain key corporate assets made by the target corporation to one of two competing tender offerers violated section 14(e) because the option contract was intended to, and did, foreclose competitive bidding for control of the corporation, dramatically depleting its value by the sale of corporate assets.

■ In this case, the record shows that neither Ogden nor Buffalo Forge intended the sale of the treasury shares and the grant of the option to foreclose additional bidding, either by Ampco or by third parties. And, in fact, the sale of the treasury shares did not foreclose competitive bidding, but rather stimulated it. Moreover, the court agrees with the defendants that Ampco does not have standing to seek rescission of the merger agreement. It is true, as Ampco argues, that section 29(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78cc(b), expressly provides that:

(b) Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder . . . shall be void (1) as regards the rights of any person who, in violation of any such provi-

sion, rule, or regulation, shall have made or engaged in the performance of any such contract . . . .

■ Under section 29(b), only an "unwilling innocent party" to a contract may attack it. *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 387, 90 S.Ct. 616, 623, 24 L.Ed.2d 593 (1970). Buffalo Forge willingly entered into the questioned contract and knew of all the facts which Ampco now claims constitute "manipulation," and thus, it may not invoke the provisions of section 29(b) to challenge the contract. *Palmer v. Thomson & McKinnon Auchincloss, Inc.,* 474 F.Supp. 286, 291 (D.Conn.1979); *Drasner v. Thomson McKinnon Securities, Inc.,* 433 F.Supp. 485, 502 (S.D.N.Y.1977).

## V. Summation

The court finds that Ampco has not met its burden of showing that a majority of the directors of Buffalo Forge acted in bad faith or from self-interest in approving the February 8 Merger Agreement with Ogden. Even if the plaintiffs had succeeded in rebutting the presumption of good faith which attaches to the actions of corporate directors, there is nothing to indicate that the sale of the treasury stock should be rescinded because it was not "fair" to the corporation. *See Treadway v. Care Co., supra* at 382.

The court finds that rescission is not a proper remedy in any event, because there is nothing to indicate that the other party to the contract, Ogden, was guilty of wrongdoing.

Ogden validly tendered the 425,000 shares to Ampco on March 9, 1981, and is entitled to payment for them at the tender price of $37.50 in cash per share, or $15,937,500.00.

Ogden validly acquired an option to purchase an additional 143,400 shares on February 8, 1981, and validly exercised that option on January 5, 1982.

Pursuant to the Ampco-Buffalo Forge merger agreement, Ogden is entitled to receive $37.50 in cash for each of the 143,400 shares as to which the option has been exercised, or $5,377,500.00.

Upon Buffalo Forge's declaration of a dividend payable March 31, 1981, Ogden became a creditor of Buffalo Forge in the amount of the unpaid dividend and is entitled to the payment of that amount, $116,875.00, with interest.

■ The only remaining issue for decision by this court is the proper determination of which rate of interest to apply to the delayed transfer of stock. Ogden advocates that payment be made with prejudgment interest at prime rate. Ampco argues that the statutory directive limits payment to either 6 percent or 9 percent.

Although the United States Court of Appeals for the Second Circuit has eschewed the practice of allowing crafty litigators the option of further appeal to avoid a debt's higher market interest rate, that cited authority does not apply to the instant case. *Bankers Trust Co. v. Publicker Industries, Inc.*, 641 F.2d 1361 (2d Cir.1981). The court in *Bankers Trust* was apparently bound to allow the statutory rate but imposed fees and double costs, for the facts of that case revealed a concerted effort on the part of appellants to delay payment. *Id.* at 1367–68. Certainly, the present case describes no extenuating factors which would prompt this court to avoid the applicable statute, New York C.P.L.R. § 5004 (amend.1972 and amend.1981) (McKinney Supp.1981).

The interest rate was raised, effective June 25, 1981, from 6 percent per annum to 9 percent per annum. C.P.L.R. § 5004 (amend.1981). The interest shall therefore be computed in accordance with the directives of C.P.L.R. § 5001(b) (McKinney Supp.1981); *United Bank Ltd. v. Cosmic Intern., Inc.*, 542 F.2d 868, 878 (2d Cir.1976).

Although Ogden asserts that equitable claims under section 14(e) would remove the statutory interest restriction, this court is unpersuaded that such a position applies here. Ogden refers to *Osofsky v. Zipf,* 645 F.2d 107 (2d Cir.1981), but that case involved a fraudulent tender offer, which does not apply to the present case. C.P.L.R. § 5001(a).

It appears that the parties can best compute the arithmetical amounts to properly reflect the directives of this court. The parties are directed to do so by affidavits filed within 15 days of the date of this order, and to prepare and submit a proposed judgment in accordance with this order and decision.

So ordered.