**TERRYDALE LIQUIDATING TRUST, Plaintiff,**

v.

**Herbert BARNESS, et al., Defendants.**

**SAN FRANCISCO REAL ESTATE IN-VESTORS, INC., Counterclaimant and Third-Party Plaintiff,**

v.

**TERRYDALE LIQUIDATING TRUST, et al., Counterdefendants and Third Party Defendants.**

**82 Civ. 7920 (LBS).**

United States District Court, S.D. New York.

Aug. 26, 1986.

See also, D.C., 645 F.Supp. 920.

Leventritt, Lewittes & Bender, Garden City, N.Y., for plaintiff; Sidney Bender, Aaron Lewittes, Janine L. Bender, of counsel.

Skadden, Arps, Slate, Meagher & Flom, New York City, for defendants; Douglas M. Kraus, Erskine D. Henderson, Barry H. Garfinkel, Mitchell C. Sockett, of counsel.

SAND, District Judge.

Plaintiff, Terrydale Liquidating Trust ("TLT"), a New York business trust that is the successor in interest to Terrydale Realty Trust ("TRT"), brought an action against San Francisco Real Estate Investors, Inc. ("SFREI") and the individual trustees of San Francisco Real Estate Investors, seeking to hold them liable as aiders and abettors of an alleged breach of fiduciary duty and as constructive trustees of property allegedly sold to them in violation of the seller's fiduciary duties and Declaration of Trust. On November 19, 1984, this Court granted defendants' motion for summary judgment in part and dismissed the claim that they were aiders and abettors of said breach. *Terrydale Liquidating Trust v. Barness*, 611 F.Supp. 1006 (S.D.N.Y.1984) (hereinafter *"Terrydale"*). Both defendants' and plaintiff's motions for summary judgment as to plaintiff's equitable claim for restitution were denied, however, because material questions of fact existed as to whether there was a breach of fiduciary obligation or Declaration of Trust and, if so, whether defendants had sufficient notice thereby such that they held the acquired assets as constructive trustees for plaintiff's benefit. *Id.* at 1012. On June 10, 1986, the action proceeded to trial. For the reasons stated below, we find that plaintiff also has failed to establish any liability on defendants' part with respect to plaintiff's claim for equitable restitution.

### FACTS

This case presents, with some significant variations, what has become a common phenomenon in the securities field: efforts by management to resist and defeat hostile takeovers by enlisting the aid of a "white knight" or other inhibitory tactics. Here, the significant variations relate to both the nature of the target and the relief sought as well as the role defendants played in the subject transaction. First, the target was a Missouri Real Estate Investment Trust ("REIT") which, under relevant IRS provisions, would have lost its preferred tax status and other benefits if five or fewer of its shareholders owned 50% of its stock. Second, having settled its claims against the target's trustees and having had its claims for other relief dismissed, plaintiff now seeks to impose upon the white knight—the entity that purchased most of its assets—a constructive trusteeship over those assets for the benefit of the target's shareholders. Plaintiff premises this claim on a theory that the purchaser knew or should have known that the sale constituted a breach of the TRT Declaration of Trust and of the target's trustees' fiduciary obligation to the target's shareholders. Plaintiff has succeeded in establishing that this Court has personal jurisdiction over the defendants and subject matter jurisdiction over plaintiff's claim for equitable restitution.

The facts underlying this litigation and its complex procedural history already have been articulated in several prior opinions. *See Terrydale*, 611 F.Supp. at 1012–1014; *see also Terrydale Liquidating Trust v. Gramlich*, 549 F.Supp. 529 (S.D.N.Y.1982); *Bolton v. Gramlich*, 540 F.Supp. 822, 827–30 (S.D.N.Y.1982). Familiarity with these prior opinions shall be assumed and the facts will be restated only to the extent necessary to set forth our findings of fact and conclusions of law pursuant to F.R. Civ.P. 52(a).

Briefly, BCG Associates (hereinafter "BCG"), a New York limited partnership, commenced an unsolicited tender offer for 160,000 TRT shares at a price of $33.50 per share. If successful, the offer would have given BCG virtual majority ownership of TRT. The TRT trustees decided to pursue alternatives to BCG's offer and "met or otherwise communicated with seven other bidders for the purpose of soliciting either a tender offer for all or part of the TRT shares or an offer to purchase the assets of TRT. The trustees also attempted, without success, to persuade BCG to amend its offer to provide for purchase of all outstanding TRT shares." *Terrydale*, 611 F.Supp. at 1013 (footnote omitted).

After a Canadian company, Unicorp Financial Corporation, decided not to enter into the battle for control of TRT, its president, George Mann, notified SFREI (40% of whose stock was owned by Unicorp) of the TRT opportunity. SFREI eventually proposed to purchase approximately 80% in value of TRT's assets (*i.e.,* four office buildings located in Denver, Colorado) after originally expressing interest in acquiring all of the outstanding TRT shares.

Several meetings of the TRT trustees followed. First, they met as a group on February 2, 1981, to consider the SFREI proposal and other alternatives to the BCG tender offer. The "independent trustees," *i.e.,* those who were not members of the Gramlich family, met on February 5 and concluded that the SFREI offer was in the best interests of all the TRT shareholders. All of the TRT trustees unanimously approved the sale of the Denver properties to SFREI on February 6 and, in addition, adopted and disclosed a liquidation plan whereby the proceeds of the SFREI sale would be distributed to TRT shareholders along with the remaining trust assets. A liquidating dividend of $24 per share would also be distributed on February 23 to all the TRT shareholders of record as of February 19.

### 1. *Breach of Fiduciary Duty*

In our most recent opinion involving this litigation, we determined that the business judgment rule/duty of loyalty analysis was applicable to the trustees of a REIT. *Terrydale,* 611 F.Supp. at 1016. We also noted that plaintiff had submitted sufficient evidence to create issues of fact regarding the self-interest of trustees John Gramlich, J. Russell Gramlich, and J. Harlan Stamper; the Gramlichs' domination and control over trustees Murphy, O'Flaherty, and Stamper (to the extent Stamper was not otherwise self-interested); and the fairness and reasonableness of the transactions at issue. *Terrydale,* 611 F.Supp. at 1019–32. Thus, for plaintiff to prevail in its remaining claim against defendants, it must prove by a preponderance of the evidence, that, under the applicable analysis, the TRT trustees breached their fiduciary duty.

■ Where business trustees have acted in good faith and have exercised honest judgment in lawful and legitimate furtherance of the trust's purposes, courts will neither inquire into nor interfere with their actions. *See Norlin Corp. v. Rooney, Pace Inc.,* 744 F.2d 255, 264 (2d Cir.1984) (quoting *Auerbach v. Bennett,* 47 N.Y.2d 619, 629, 419 N.Y.S.2d 920, 926, 393 N.E.2d 994, 999 (1979)).[1] This posture of respect is affiliated with the "duty of care" prong of the trustee's duty to the shareholders—*i.e.,* "the responsibility of a ... fiduciary to exercise, in the performance of his tasks, the care that a reasonably prudent person in a similar position would use under similar circumstances." *Norlin, supra,* 744 F.2d at 264; *see also Hanson Trust PLC v. ML SCM Acquisition, Inc.,* 781 F.2d 264, 273 (2d Cir.1986). The duty of loyalty, the second prong of a trustee's obligation to shareholders, "derives from the prohibition against self-dealing that inheres in the fiduciary relationship." *Norlin,* 744 F.2d at 264. Once plaintiff has made a prima facie showing that the trustees had a self-interest in the subject transaction, "the duty of loyalty supercedes the duty of care, and the burden shifts to the [trustees] to 'prove that the transaction was fair and reasonable to the trust.'" *Norlin,* 744 F.2d at 265 (quoting *Treadway Companies, Inc. v. Care Corp.,* 638 F.2d 357, 382 (2d Cir.1980); *see also Hanson, supra,* 781 F.2d at 273.

The Second Circuit has recently written that "[i]t is not enough that [trustees] merely be disinterested and thus not disposed to self-dealing or other indicia of a breach of the duty of loyalty." *Hanson, supra,* 781 F.2d at 274. Rather, they also must meet the standard of due care "with 'conscientious fairness'"—*i.e.,* they must

---

**1.** *See also Wolgin* v. *Simon,* 722 F.2d 389, 393 (8th Cir.1983). As we already have concluded, Missouri law is applicable in the instant case. *Terrydale,* 611 F.Supp. at 1015. However, "[t]o

the extent that no directly applicable Missouri precedents exist," we utilize the law from other jurisdictions for guidance. *Id.; see also id.* at 1018.

make informed decisions after "gathering and considering material information" with "reasonable diligence." *Id.* (citation omitted). If they adhere to " 'methodologies and procedures' [that] are 'so restricted in scope, so shallow in execution, or otherwise so *pro forma* or halfhearted as to constitute a pretext or sham,' then inquiry into their acts is not shielded by the business judgment rule." *Id.* (quoting *Auerbach, supra,* 419 N.Y.S.2d at 929, 393 N.E.2d at 1002–003); *but see id.* at 285–91 (Kearse, J., dissenting).

Plaintiff alleges the two Gramlich trustees' self-interest as predicated upon desired continued management of the properties and the receipt of fees and commissions therefrom as well as their personal debt situation. Defendants seem to have conceded that the two Gramlich trustees were "interested" (*see* Letter of June 30, 1986 from Attorneys for Defendants at 6), but, more importantly, the remaining trustees perceived the Gramlichs to be "interested" and arranged to meet separately to discuss the SFREI transaction. *See, e.g.,* Tr. 484–85.

We note, however, that although plaintiff contends the Gramlichs' dire financial straits prompted their desperation to consummate the deal with the "white knight" which led to the sacrifice of the best interests of the shareholders (*see Terrydale,* 611 F.Supp. at 1020–21), this does not appear to have been the case. While it is true the Gramlichs had a $890,872 loan obligation falling due on February 10, 1981 (*id.*), J. Russell Gramlich testified that the payments on the note could have been met by turning the Gramlichs' stock over to BCG at the last moment if "[they] had no better offer for our stockholders." Tr. 1419–20. Michael Gramlich apparently "was in Kansas City with all [of the] stock ready to tender it to the Grace people in case this deal didn't go through with [SFREI]." Tr. 1431. Although this plan poses certain difficulties regarding John Gramlich's and Michael Gramlich's apparent ignorance of it (*see* Plaintiff's Supplemental Memorandum of Law of July 29, 1986 at 49–52 ("Plaintiff's Supp. Memo.")),

the Gramlichs' prior announcement advising shareholders not to tender their stock, and possible short-swing profit problems, 15 U.S.C. § 78p(b), it at least indicates that the Gramlichs were not as "desperate" as plaintiff intimates. Moreover, J. Russell Gramlich also testified that his other investments could have helped cover the loan. Tr. 1419.

We also reject plaintiff's contention that the Gramlichs' self-interest and bad faith likewise were demonstrated by their decision to announce the consummation of the transaction no later than Friday, February 6, 1981. According to plaintiff, the documentation regarding rent adjustments supports its view that the closing did not take place until Monday, February 9, 1981. Pretrial Order at Exh. 3B ("Plaintiff TLT's Factual Contentions") ¶ 182; Tr. 602. Thus, the Gramlich trustees allegedly accelerated the announcement so that the TRT shareholders would know they would receive a liquidating dividend and thereby defeat the BCG tender offer. This acceleration also allegedly prevented BCG from seeking to enjoin further consummation of the closing because of the latter's belief that the entire deal had been finalized on February 6, 1981.

In fact, as Stamper testified, a title company acting as TRT's agent had received the proceeds of the sale on February 6, 1981 "and they had held it over the weekend because they had no means to transmit it until Monday." Tr. 595; 600–01. It was therefore TRT's position that it had the right to declare the dividend on February 6, 1981. Most importantly, however, on the facts of the case and the state of events at that time, it seems highly improbable that any court would have granted BCG injunctive relief.

■ Assuming the Gramlich's self-interest, though, "the Board *as a whole* cannot be charged with having acted from self-interest where less than a majority are found to have done so." *Buffalo Forge Co. v. Ogden Corp.,* 555 F.Supp. 892, 904 (W.D. N.Y.) (emphasis added) (citing *Treadway,*

*supra,* 638 F.2d at 358), *aff'd,* 717 F.2d 757 (2d Cir.), *cert. denied,* 464 U.S. 1018, 104 S.Ct. 550, 78 L.Ed.2d 724 (1983); *but see Dynamics Corp. v. CTS Corp.,* 794 F.2d 250, 256 (7th Cir.1986) (a conflict of interest is not cured by vesting the power of decision in a board of directors in which insiders are a minority). We are satisfied as a factual matter that of the non-Gramlich trustees, Stamper was not "improperly influenced by personal considerations or benefits not available to other shareholders generally" (*see Terrydale,* 611 F.Supp. at 1022 (citations omitted)) and Murphy, O'Flaherty, *and* Stamper were not so dominated and controlled by the Gramlichs that their independence and financial disinterest were overcome. *Id.* at 1022 (citing *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984)). Although it was bad judgment to allow the personal attorney for the Gramlichs and TMC, James Polsinelli, Esq., to attend the independent trustees' meeting, we find that Polsinelli's presence at that meeting did not undermine the independent trustees' careful and objective consideration of the SFREI offer and their primary concern for the interests of all of the shareholders.[2] *See* text *infra.*

Lack of self-interest alone, as we already have noted, is not enough to satisfy a fiduciary's duty of care. In *Hanson, supra,* the Second Circuit reversed the district court's denial of a motion for a preliminary injunction restraining the exercise of a lock-up option despite the fact that it agreed that the defendants had not acted fraudulently, in bad faith or out of self interest. 781 F.2d at 274. According to the court, what made out a prima facie case of a breach of the duty of care, shifting the burden of justification to the defendants, was the failure of the directors "to take many of the affirmative directorial steps that underlie the finding of due care." *Id.* at 275. For example, the directors had voted for the lock-up option with a "paucity of information" after a three hour meeting, thereby not availing themselves of the week's time available before the tender offer deadline. 781 F.2d at 271, 275. Moreover, if they had inquired into the value of the two optioned businesses (which generated half of the target's income but represented only one-third of the purchase price for the entire company) rather than "contented themselves with their financial advisor's conclusory opinion that the option prices were 'within the range of fair value,'" they would have learned that the range of fairness had not been calculated and Goldman Sachs had not even prepared a written opinion as to the value of the two optioned businesses. *Id.* at 275. According to the Second Circuit, other things evidencing the improper exercise of due care included the fact that the target's principal financial advisor indicated that an "orderly sale" could achieve higher prices for the optioned businesse.., no opinion had been offered as to what kind of company the target would be without these "core" businesses, and the Board had failed to ensure the negotiations of alternative bids and, in essence, rubber-

---

**2.** We also find credible the independent trustees' testimony on this matter. Murphy, for instance, testified that he did not recall Polsinelli having made any comments and that his presence had not at all affected Murphy's thinking. Tr. 160, 191. O'Flaherty, who himself called for the meeting, testified that Polsinelli had asked Stamper whether or not he could attend the meeting and that Stamper told Posinelli it would probably be all right. Tr. 510. O'Flaherty, in line with his duty as chairman of the meeting, questioned Polsinelli's presence, but "had great trust in Mr. Stamper's judgment." *Id.* O'Flaherty also did not recall Polsinelli's making any particular statements at the meeting. *Id.; see also* Tr. 512. Although Stamper "signed the minutes for the meeting which said,

'As the attorney for the Gramlich family, Mr. Polsinelli believed that the Gramlichs would have preferred that the trust purchase Stern warrants'" (Tr. 750), he, too, considered Polsinelli's presence "immaterial." Tr. 678, 682.

Moreover, we note that even if the comments made by Polsinelli at this meeting accurately portray his role as one of urging adoption of the SFREI plan, our conclusion remains unaltered. *See* Plaintiff's Exh. 14A (in addition to what is stated above regarding the Stern warrants, Polsinelli commented twice during the meeting that other potential buyers would not pay what SFREI was offering and stated once that they had to "take a hard look at whether or not we should liquidate").

stamped a proposal engineered by management directors holding a potential 15% equity interest in the arrangement. *Id.* at 276–77; *see also id.* at 269–70.

■ This Court finds that in the instant case, the trustees properly exercised their duty of care. The Board in *Hanson* was faced with an unsolicited tender offer for "any and all shares of [the target's] common stock" for a price per share that was conditionally raised *twice* without the target's request during the course of leveraged buyout negotiations between the target and a third party. 781 F.2d at 270, 272. In contrast, the TRT trustees faced a partial tender offer replete with potential disadvantages.[3] Like the Board in *Hanson*, the TRT trustees sought out other alternatives under tremendous time pressures; however, the latter also unsuccessfully sought to negotiate with the tender offeror for the purchase of *all* outstanding TRT shares while the former ignored the tender offeror's "overtures for discussions." *See* 781 F.2d at 269, 270.

Although discussions with SFREI did not develop into a final proposal until approximately February 5, 1981, the TRT trustees had been discussing the proposed asset sale as well as other alternatives since February 2, 1981. Thus, their unanimous vote for the final proposal on February 6, 1981 followed four days of consideration compared to the three hours in which the independent trustees in *Hanson* for the first time learned about and approved the new leveraged buyout merger agreement and the proposed lock-up option. 781 F.2d at 271; *see also Dynamics Corp., supra,* 794 F.2d at 256–257 (target's management announced its opposition same day unsolicited tender offer was announced *without* studying any business or financial implications of tender offer or consulting with target's outside directors). Moreover, the transaction at issue in *Hanson* demanded the

Board's *"heightened* duty of care" in order to ensure that one did not cross the critical line between a price low enough to lure a reluctant potential bidder and one lower than " 'reasonable permission w[ould] allow.' " 781 F.2d at 276 (emphasis in original) (citations omitted). Since no lock-up option was at issue in the instant matter, a *"heightened* duty of care" was not demanded.

Plaintiff emphasizes certain factors as evidencing the TRT trustees' breach of their duty of care. These factors relate to the Gramlichs' self-interest in defeating the BCG tender offer and how this self-interest allegedly led to a sacrifice of the property at distressed prices. *See* Plaintiff's Memorandum of Law Opposing Defendants' Motion to Dismiss, Under the Business Judgment Rule (June 27, 1986) at 7.[4] According to the Second Circuit in *Hanson,* to the extent that self-interest impacts upon the duty of care even after a court has determined that there was no fraud, bad faith or self-dealing, it calls upon independent trustees to take "at least some of the prophylactic steps that were identified as constituting due care in *Treadway* [, *supra* ]" when a self-interested management has made the proposal at issue. *Hanson,* 781 F.2d at 277. In *Hanson,* however, on top of its 15% equity interest, management was discussing a leveraged buyout with the investment banking concern ultimately hired as the Board's advisors *before* the Board first met to discuss the unsolicited tender offer, and it was management and these advisors who generated a response to the tender offeror's raised bid. 781 F.2d at 277. Confusion over whether the law firm Wachtell, Lipton, Rosen and Katz represented management or the Board, moreover, continued "[e]ven after [the firm] was formally retained by the Board." *Id.* Not only were none of these factors present in the TRT transaction, but the Gramlichs certain-

---

**3.** In fact, in *Hanson,* the Board seems never to have made any determination regarding the advantages or disadvantages of the unsolicited tender offer. *See* 781 F.2d at 268. In the month before the tender offer was first announced at a price of $60 per share, moreover,

the target's stock was trading at below $50 per share. *Id.*

**4.** The Court reserved decision on defendants' motion on June 30, 1986. Tr. 1489.

ly did not present the independent trustees with the SFREI proposal "more or less as *faits accompli,* which [the independent trustees] then quite hastily approved." *Id.* The Gramlichs also did not do something that was appropriately criticized in *Dynamics Corp., supra,* 794 F.2d at 256–257 —hire an investment advisor to prepare a "fairness opinion" who was to receive a bonus if the tender offeror lost a proxy fight.

Even if the Gramlichs' alleged interests amounted to the same sort present in *Hanson,* a finding of a breach of the duty of care would not be warranted. In *Treadway, supra,* the directors, among other things, hired an investment banking firm to negotiate for them and to assist in evaluating the various proposals, asked numerous questions and requested pro forma balance sheets for the combined company, and conditioned their approval of the transaction on obtaining an opinion regarding its fairness. 638 F.2d at 384. Nowhere, however, have these actions been prescribed as the sole means by which this duty can be fulfilled. *See Dynamics Corp., supra,* 794 F.2d at 258 (particular methodology used by target to analyze tender offer would have been of "little moment" if the defensive tactic adopted had been acceptable because the court had "no desire to force boards of directors into a judicialized mode of proceeding and ... recognize[d] the time pressure under which the board was operating").

Here, the independent trustees called a separate meeting pursuant to their own initiative. *See* text *supra.* They also knew that the cash each shareholder would receive was approximately the same under either proposal, but that only a deal struck with SFREI would benefit *all* the shareholders;[5] that no other "white knight" was willing to offer anything above this value; and that the BCG tender offer might not only wreak havoc with TRT's tax status but also could leave minority shareholders in a very disfavorable position. The independent trustees even considered revaluing the Denver properties and concluded that other problems would obviate the predictability and worth of new appraisals, Plaintiff's Exh. 14A (*e.g.,* the instability of the Denver market; the various encumbrances on the properties; etc.); moreover, the time exigencies created by the BCG tender offer mooted this possibility. Finally, by pledging their approval of the SFREI proposal, they did not foreclose further bidding for TRT. *See Hanson,* 781 F.2d at 264; *see also Dynamics Corp., supra,* 794 F.2d at 258. In fact, the BCG tender offer was instead extended and adjusted to reflect the liquidating dividend, by January, 1982, BCG had acquired just under 50% of the outstanding TRT stock, and a slate of BCG nominees was elected to serve as trustees of TLT when it was created on January 28, 1982. *Terrydale,* 611 F.Supp. at 1014.[6]

Even if we found that the TRT trustees had breached their duty of care, we would need to determine whether the shifted burden of proving the fairness and reasonableness of the transaction has been

---

**5.** Plaintiff alleges that in *Dynamics Corp., supra,* the Seventh Circuit rejected a similar justification proffered by management. There, CTS's contention that the tender offer could not be considered fair when Dynamics was seeking only 17.9 percent of the shares was rejected because (a) since Dynamics already owned 9.6 percent of the shares, every fifth shareholder would get the price it now offered, and (b) all the shareholders benefited *ex ante* due to the fact that the announcement of the tender offer caused the stock's price to rise. *Dynamics Corp., supra,* 794 F.2d at 257. The Seventh Circuit did admit, however, that "some stockholders would not have known about the movement in the price and some who did know

would adhere to a buy-and-hold strategy, and so not sell." *Id.* Finally, as we already have noted, all of this would have been of "little moment" to the Seventh Circuit if the adopted defensive tactic had been "a plausible measure for maximizing shareholder wealth." *Id.*

**6.** Since we have held that the independent trustees were not so dominated and controlled by the Gramlichs that their affirmative votes for the SFREI transaction and the liquidation plan were rendered invalid, we conclude that the sale to SFREI was not in violation of TRT's Declaration of Trust, Article III, § 14. *Terrydale,* 611 F.Supp. at 1012, 1032–33; *see* note 10 *infra.*

met. *See Hanson,* 781 F.2d at 277. We find that such is the case.

It should be noted at the outset that the idea of liquidating TRT was *not* first promulgated as a response to the BCG tender offer. John Gramlich had been suggesting liquidation "for a couple of years" (Tr. 205; *see also* Tr. 1264) in order to deal with a problem REITs collectively had been facing—the undervaluation of their stock. *See* Tr. 841; 1237–38; 1843. As Stamper testified at trial,

> [W]e had discussed whether there would come a time where we had a duty to the shareholders because of the underlying value to liquidate and give them their money back. The reason we had considered it more than a year before was because the value of our shares had gotten down to somewhere around 12 or 14 dollars, as I recall it, and we wondered whether it was fair to the shareholders to just continue giving them dividends at the level we were able to or whether we ought to actively consider selling the properties and giving them their money back and letting them reinvest in something else.

Tr. 564. Courts generally have treated challenged transactions that facilitate plans which were under consideration *before* anyone moved to acquire stock *more favorably* than those "cooked up" solely in response to contests for control. *See Norlin, supra,* 744 F.2d at 265 n. 7; *see also Treadway, supra,* 638 F.2d at 383; *Crouse-Hinds Co. v. Internorth,* 634 F.2d 690, 703–04 (2d Cir.1980). Thus, it does not "strain[ ] credulity" to discern merit in the SFREI transaction and subsequent TRT liquidation. *Norlin,* 744 F.2d at 265.

That such merit conceivably is present is buttressed by a comparison to *Joseph E. Seagram & Sons, Inc. v. Abrams,* 510 F.Supp. 860 (S.D.N.Y.1981). There, a tender offer prompted the board, once legal proceedings collapsed, to announce "a proposed buy-out of a small segment only of stockholders, using the corporate till to accomplish this at a price [$15 per share above the tender offer price] and with a preferred stock issue in the background...." 510 F.Supp. at 861. A "frenzied search for a competitive third party offer" had not as yet panned out and "a proposed selling off of the assets was in contemplation by a plan to seek the sale of [the target's] attractive properties, ... one of.... which yield[ed] 10% of the corporate earnings, and to raise more cash to buy in more stock in that way with the company's treasury." *Id.* at 861–62. In issuing a temporary restraining order sought by the tender offeror, Judge Pollack opined that "[i]t [wa]s inconceivable that an alleged flourishing enterprise ha[d] authorized its board to subject ... the company to a scorched earth policy ... merely to thwart. a change in existing stock ownership which may end the tenure of the present directors and key officers of the company." *Id.* at 861.

Plaintiff has attempted to show that the sale of the Denver properties was not fair to TRT and its public shareholders because the buildings were grossly undervalued. Specifically, plaintiff has alleged that the June 1980 appraisal of the Lincoln Tower Building prepared by Blain Chase understated its true value as $18,000,000. Plaintiff claims that this undervaluation was evidenced by the November 1982 sale closing of the same building by Lincoln Tower Building Company (when values in the Denver office building market were lower) to Subdale Corporation for $26 million. Plaintiff also points to Chase's "Preliminary Revaluation" of the fee in the amount of $24 million on February 2, 1981. Plaintiff further claims that Chase, *inter alia,* utilized in his June 1980 report a capitalization rate that was too high and an economic rental rate that was too low.

With respect to the Petroleum Building, sold to SFREI for $6,713,000, plaintiff claims that the revised appraisal of Van Court & Company (October 1980) overlooked both a significant change in rental rates and the sale of the Lincoln Center Building, the same sale that had prompted Chase's "Preliminary Revaluation" of the Lincoln Tower Building. Plaintiff also

claims that the market in February 1981, when TRT sold the Petroleum Building, was no different than that in December, 1981, when SFREI did a property analysis and evaluation of its leasehold interest in the building and valued it at $12,400,000 ("almost double what it paid TRT"); Joseph J. Blake & Associates received and concurred with SFREI's estimate of current fair market value. Plaintiff's Exh. 62.

As to the Travelers Building (also known as the "101 University Building"), sold to SFREI for $2,485,000, plaintiff first claims that TRT itself admitted in January, 1981 that it appraised the building to Mid American Bank at $4 million. Plaintiff also claims that the May 1980 Van Court & Company appraisal was obsolete as of February, 1981 due to the fact that the entire building became vacant on July 31, 1980, allowing SFREI to lease the entire building at the then higher current market rates. Finally, plaintiff once again compares the appraisal to SFREI's own December, 1981 property analysis and evaluation, with which J. Blake and Associates concurred, valuing the leasehold interest at $4,950,000. Plaintiff's Exh. 48. With respect to the Century Bank Building, plaintiff also claims that TRT sold its fee interest at a price substantially below the building's fair market value.

Plaintiff's expert witness, Joseph Farber, MAI, CRE, also estimated the value of the leasehold estate interests in three of the subject properties as of February 6, 1981. Mr. Farber concluded in his report that the values were as follows: (a) Lincoln Tower Building—$17,150,000; (b) Petroleum Building—$11,750,000; (c) Travelers Build-ing—$3,875,000. Plaintiff's Exh. 662 at 3. He also concluded that the value of the third mortgage owned by TRT against the Lincoln Tower Building was $6,930,000 and that the value of the leasehold estate interest in this same building may have increased somewhat by the later April 22, 1981 date. *Id.*[7]

We find that the burden of justification for the transaction has been met primarily by the introduction of "evidence to rebut [plaintiff's] extensive evidence that the [building] prices were undervalued." *Hanson*, 781 F.2d at 277. The Court's role, of course, is not to ascertain "the 'precise value'" of the buildings. *Id.* at 278; *cf. Alpert v. 28 William St. Corp.*, 63 N.Y.2d 557, 483 N.Y.S.2d 667, 675, 473 N.E.2d 19, 26 (1984). Rather, it is to determine whether the burden of proving that the SFREI transaction was fair and reasonable has been met. For example, in *Lewis v. S.L. & E., Inc.*, 629 F.2d 764 (2d Cir.1980), a shareholder's derivative suit where it was alleged that the corporation's assets were wasted, the Second Circuit held that defendants had failed to prove that the rental paid for the years 1966–72 was fair and reasonable. However, although it noted that defendants' own evidence supported plaintiff's suggested fair rental value, the Court *never* determined for its own purposes the precise rental rate. *Id.* at 772.

With respect to the valuation of the four Denver properties sold to SFREI, this Court is convinced that the marketplace at that time was its most faithful indicator. First, the trustees never quarreled with the fairness of the BCG price of $33.50 per share and would have approved the tender

---

7. *See also* Plaintiff's Memorandum of Law Covering SFREI Liability and Duty of Restitution of July 17, 1986 at note 7.

Plaintiff also alleged at trial that the availability of below-market financing on the properties added value to the transaction and should have been recognized in the cash component of sales proceeds received by the seller. Plaintiff's Exh. 663 (Report prepared by David Kaplan, Senior Vice President of The Harlan Company, Inc.); *see also* Tr. 1540–43. It is unlikely, however, that after negotiating with a lender over potential assumption of a mortgage with a due on sale clause (negotiations involving payment to the lender, thereby raising the interest rate) that the buyer would reward the seller with a higher purchase price. Tr. 1543–46. More importantly, however, buyers could choose to take what they would have to pay up front to assume the mortgage to open a CD and utilize the considerable interest so generated. *See* Tr. 1560–65. Down the road, those buyers could refinance at a more favorable rate, *id.;* thus, they would still have the lump sum available to them that others who had purchased the below-market financing could never recoup. Tr. 1568.

offer if they had been successful at convincing BCG to make it available to *all* TRT stockholders. *See, e.g.,* Tr. 144–45; 147; 195–96; 500; 698; 702; 1249–50. Second, in Murphy's words, "at least seven sophisticated investors [refused] to pay more than, at least offer [sic] $33 and a half a share." Tr. 148; *see also* Tr. 707–08, 752, 1246–48. As one of the defendants' expert witnesses testified, a "spotlight" was on TRT as early as December, 1981 when the Grace people filed a 13D form, soon followed by a proxy fight and tender offer. Tr. 1813 (testimony of Jeffrey Bloomberg, Managing Director of Bear Stearns & Co.). These events indicated to the world at large that a public company was "in play and anyone interested in acquiring assets for [sic] the company is alerted that the assets or the company will be available and starts to make inquiry." Tr. 1814. Thus, under such circumstances, interested parties tend to surface and the offers tend to approximate the current fair market value. Tr. 1850.

We also do not find any merit in plaintiff's contention that John Gramlich's search for a deal at $35 per share (knowing he would have "to settle somewhere in between 35 and 33.50," Tr. 811) effectively proscribed higher offers. Tr. 1484. Not only were four of the trustees themselves in the real estate business (*i.e.,* the Gramlichs, O'Flaherty, and Murphy), making it extremely doubtful that they would be unaware of the trust's "unburied treasure" (*see* text *infra*), but if the value of the stock was as high as plaintiff projects, SFREI would not have been the only bidder.

8. According to Mr. Farber, there is no definitive description of class A and class B buildings and what is usually meant when these terms are utilized is how a given building competes with others "of the same genre on the same floor plate and the same elevating [sic] system." Tr. 1997–98 ("the basic definition of a class A building is how does his rent compare with his competition"). He also stated that the age of the building would not preclude it from falling into the class A category and that the Lincoln Tower Building, although constructed in 1965, was a class A building. Tr. 1998–99.

In *Hanson, supra,* where one of the businesses was optioned at $350 million, "one of the first potential 'white knight' leveraged buyout firms ... contacted ... valued [that particular business] at about $550 million as part of its consideration as to whether it would make a tender offer...." 781 F.2d at 279. No such evidence from other prospective bidders was adduced here. In fact, the principals of BCG themselves declined to bid for the very building (Lincoln Tower) plaintiff now claims was worth at least $24 million when the Lincoln Tower Building Company offered it to them for approximately $19 million on or about February 17, 1981 (the latter was prepared to first exercise its option to acquire the building from SFREI). Pretrial Order at Exh. 10B(i) ("SFREI's Proposed Findings of Fact Relating to Plaintiff's Claims Against SFREI") ¶¶ 148–49; Tr. 1032–35; *see also* Letter from Defendants' counsel of July 24, 1986 at 8–9.

Defendants' own expert witness, E. Nelson Bowes, MAI, CRE, reviewed the appraisals for the four Denver properties on which the sale price was based and concluded that they were reasonable both at the time they were rendered *and* on February 6, 1981. We agree with Bowes' conclusion. With respect to the Lincoln Tower Building and Blain Chase's February, 1981 "Preliminary Revaluation," we agree that even if one were to characterize it as a new appraisal, others knowledgeable in real estate may have found it inappropriate to apply the capitalization rate that had been utilized to appraise the Lincoln Center Building, a newer, different class building (*i.e.,* class A, while Lincoln Tower was class B) [8] situated in a better location. Thus, what-

Although we accept that this may be the viewpoint of some appraisers, we cannot find any reason to criticize the viewpoint of others in the real estate business who *do* see age as one of the decisive factors in valuation. Moreover, it appears that it was not only the class differential which led defendants' expert, E. Nelson Bowes, to conclude that the Lincoln Center Building was not a good comparable for the Lincoln Tower Building. *See* Defendants' Exh. U at 16–17; Tr. 1645–47; 1653.

ever plaintiff's explanation is for Chase's subsequent retraction from his February, 1981 "Preliminary Revaluation," (Pretrial Order at Exh. 3B ("Plaintiff TLT's Factual Contentions") ¶ 102; *see also* Chase Dep. of May 16, 1984), the bottom line is that it was reasonable for the TRT trustees that knew about it (*see, e.g.,* Tr. 82, 88–89, 556, 816, 829, 832, 835–37; *contra* Plaintiff's Supp. Memo. at 1–12) not to have relied upon it. In fact, Stamper, John J. Gramlich and J. Russell Gramlich all testified that even if the Lincoln Tower Building had been worth $24 million in February, 1981, they would have voted for the SFREI sale (primarily because it took *all* of the shareholders out for the most money then offered). *See* Tr. 556–57, 837–39, 1447; *see also* text *infra.*

Plaintiff's criticisms of the methodology and numerical data (*e.g.,* for rental and capitalization rates, Plaintiff's Exh. 662) used in the original appraisals of all of the buildings also have been adequately addressed by the defendants (*see generally* Defendants' Exh. U (Bowes' Appraisal Review Four Buildings); Tr. 1872–1986) and changes in the Denver rental market from the appraisal dates up until February 6, 1981 seem to have only either compensated for earlier overvaluations or made minor differences in the ultimate price. Moreover, what impresses this Court most with respect to the validity of these original appraisals is that neither the appraisers nor the owners themselves, who were valuing their own property, had any motivation to misstate the value. *See* Tr. 1882 (Farber himself "did not think that there was any intention of any of these appraisers to in any manner, shape or form come to a conclusion that was made as instructed by a client").

Compared to what the *Hanson* court found raised a serious question that the assets had been significantly undervalued, the criticisms voiced here, even if justified, seem minor. *See Buffalo Forge, supra,* 555 F.Supp. at 905 (noting that valuations are not an exact science); *see also* Tr. 1883

(testimony of Joseph Farber) (stating that real estate appraisal is an art rather than a mathematical science). In addition to what already has been mentioned, the target's principal advisor in *Hanson* (its investment banker at Goldman Sachs) himself testified that he had utilized tonnage, " 'a lousy way to value' " one of the optioned businesses and had employed a very significant measure of valuation, expected *earnings,* with "the two lowest actual and projected earnings years in a ten-year sequence." 781 F.2d at 278. Moreover, using his own firm's valuation charts and applying what he considered appropriate price-earnings ratios at the evidentiary hearing, he valued one of the target's divisions at a minimum of $70 million above the price it had been optioned for. *Id.* at 279; *see also id.* at 280 n. 10. With regard to the other division optioned in the *Hanson* transaction, " 'no document was produced in discovery which reflect[ed] a valuation or divestiture of [it] at less than $100 million prior to the grant of the Lock-Up Option;' " nonetheless, it was optioned for $80 million. *Id.* at 270, 280; *see also Dynamics Corp., supra,* 794 F.2d at 258–259 (criticizing poison pill that, among other things, burdened the target with a new, long-term fixed debt and precluded a hostile tender offer).

Probably what is most indicative of the fairness of the SFREI transaction relates to the Gramlich trustees' 30% equity interest in TRT. As Bloomberg testified, the situation at hand did not involve "professional management [which generally] has a different axe to grind; [rather, what was involved was] a trustee group that ha[d] a great economic interest in maximizing the value for all shareholders." Tr. 1822; *see also* Tr. 1810. If the assets were truly undervalued, the Gramlichs would have been forfeiting a tremendous sum of money for nothing in return—*i.e.,* "the sale to San Francisco didn't carry a golden parachute or long-term employment contract so that [the Gramlichs] would get money as opposed to other shareholders." [9] Tr. 1810,

---

9. Plaintiff intimates that the management fees and commissions received by TMC after the

asset sale and liquidation (*Terrydale,* 611 F.Supp. at 1019) were a "material benefit" not

1822. There is thus lacking a motivation for allegedly underselling the shareholders. In essence, the interests of the rest of the shareholders were on a par with those of the Gramlichs and everyone concerned received the same benefits from the liquidation.

BCG's own refusal to extend its offer to 100% of the available shares or effectuate any "second step" or "back end" transaction to acquire the shares not purchased pursuant to the tender offer adds support to this conclusion. See Tr. 1803–04. So does the uncertainty of the remaining alternatives. For instance, plaintiff contends that an orderly liquidation in the year following the tender offer would have maximized the return to TRT shareholders. However, there was no guarantee that BCG would choose to liquidate following a successful tender offer; it had previously refrained from committing itself to such a course of action and even a decision to subsequently liquidate may not have been to the remaining shareholders advantage. Tr. 1805; Defendants' Exh. W (Jeffrey Bloomberg's Opinion Letter) at 8. If the TRT trustees had made their own announcement urging shareholders to reject the BCG offer in lieu of a planned liquidation one year down the line, moreover, defeat of the partial tender offer was equally unlikely. Tr. 1801–02, 1849; see also Defendants' Exh. W at 7; *Dynamics Corp., supra,* 794 F.2d at 254; Lowenstein, *Pruning Deadwood in Hostile Takeovers: A Proposal for Legislation,* 83 Colum.L. Rev. 249, 254, 307–09 (1983). Its success would have resulted in a loss of REIT status and the resulting diminished value of the company as well as a fall in the stock's market price. *See* Defendants' Exh. W at 5–6.

This is *not* an instance where the trustees " 'end[ed] the auction with ... little objective improvement' " or wanted SFREI

"in the picture at all costs." *Hanson, supra,* 781 F.2d at 283 (quoting *MacAndrews & Forbes Holdings, Inc. v. Revlon,* 501 A.2d 1239, 1249 (Del.Ch.), *aff'd,* 505 A.2d 454 (1985)). Rather, the trustees selected the best offer available at a time when some immediate action was mandated. *See Buffalo Forge, supra,* 555 F.Supp. at 904.

We have scrutinized the transaction with great care because we recognized that certain of its attributes rendered it superficially suspect—*e.g.,* the willingness of defendants to purchase the Lincoln Tower Building subject to a right of first refusal; the seller's request that the buyer render an opinion as to the TRT trustees' ability to conduct the transaction. *See, e.g.,* Tr. 1300–01; 1320–23; 1391. Nevertheless, in our view, the transaction has been justified by the fact that the values at which the properties were sold to SFREI were fair and reasonable and the way it served other important trust and shareholder interests. *See Norlin,* 744 F.2d at 267; *see also* Defendants' Exh. W at 6 and text *supra; Terrydale,* 611 F.Supp. at 1025; *Alpert, supra,* 483 N.Y.S.2d at 676, 473 N.E.2d at 27 (transaction must have involved not only fair dealing and fair price, but must have treated all shareholders equally). Unlike the action taken by the directors in *Hanson,* this action, viewed in its entirety, "redound[ed] to the benefit of [TLT] and its shareholders." *Hanson,* 781 F.2d at 281.

### 2. Knowledge of Breach of Fiduciary Duty

Even if the TRT trustees had breached their fiduciary duty, a duty of restitution could be imposed on SFREI only if the latter knew or should have known that a breach had been committed. *Terrydale,* 611 F.Supp. at 1031. In other words, the defendants can only be held liable as constructive trustees of the transferred properties if they knew or should have

available to other shareholders. *See* Pretrial Order at Exh. 3B ("Plaintiff TLT's Factual Contentions") ¶ 19; *see also* Tr. 1822. However, if the properties were truly valued as plaintiff alleges, the Gramlichs would have suffered a tremendous loss by opting instead for these fees

and commissions. Moreover, one of defendants' experts testified at trial that he had "looked at the fees involved [and] these people were not overpaying themselves when they adopted the plan of liquidation." Tr. 1822 (testimony of Jeffrey Bloomberg).

known that a breach of fiduciary duty had occurred. *Id.* at 1032.[10]

At trial, we noted the burden that would be imposed by holding a purchaser "chargeable with all that goes on in the inner councils of the seller" simply by virtue of the fact that the former either has made a bargain purchase or is aware of the seller's distress. Tr. 765; *see also Terrydale,* 611 F.Supp. at 1030–31. However, this is a bridge we need not cross as we are convinced that if the values of the TRT properties were such common knowledge that anyone operating in the market would or should have known of them, TRT would have been able to obtain an offer at a higher price than that proposed by SFREI. As we have already rejected other explanations offered for the market's silence, we conclude that SFREI cannot be presumed to have known that the TRT trustees had breached their fiduciary duty.[11]

Other factors also lead to this conclusion. As we noted earlier, defendants made certain "uncontradicted assertions establish[ing] the basis for their belief in the reasonableness of the transaction from TRT's point of view" (*Terrydale,* 611 F.Supp. at 1029)—*e.g.,* legitimate reasons for opposing the BCG tender offer; its offer to purchase TRT's assets was higher than any other offer on a per share basis; instability of the Denver market and risks associated with acquiring the TRT properties derived from " 'due on sale provisions,' necessary renovations, [and] long-term leases at unfavorable rents." *Id.* Thus, to the extent, if any, that defendants were required to make an inquiry,[12] they fulfilled their duty and came up with sufficient facts to reasonably conclude that the trustees had not breached any duty and that SFREI's purchase of the assets would be legitimate. *See* Pretrial Order at Exh. 10B(ii) ("SFREI's Proposed Conclusions of Law Relating to Plaintiff's Claims Against SFREI") ¶¶ 112–24 and cases cited therein.

Finally, we have previously noted that the Restatement (Second) of Trusts "provides appropriate and helpful guidance in resolving the issue of notice." *Terrydale,* 611 F.Supp. at 1031 n. 44:

> Among the circumstances which are or may be of importance are the following: (1) whether he knows that the person with whom he is dealing is in fact a trustee; (2) the extent to which he has reason to believe that the person with

10. In our most recent prior opinion, we noted that SFREI's actual knowledge of a breach of duty must be proven in order to sustain plaintiff's claim of aiding and abetting. *Terrydale,* 611 F.Supp. at 1027. We dismissed the claim because no genuine issue had been created "regarding SFREI's alleged knowledge of the unfairness and lack of business purpose surrounding the sale and liquidation transaction." *Id.* at 1028. Furthermore, since we have concluded that there was no violation of TRT's Declaration of Trust (*see* note 6 *supra* ), defendants cannot be held as "constructive trustees" under the theory that they "should have known" that the independent trustees were dominated and controlled by the Gramlichs, rendering their votes for the transaction invalid. *Terrydale,* 611 F.Supp. at 1033. Thus, in order to impose a duty of restitution on SFREI, plaintiff really must prove that SFREI should be presumed to have known that a breach of fiduciary duty had been committed. *See* Pretrial Order at Exh. 10B(ii) ("SFREI's Proposed Conclusions of Law Relating to Plaintiff's Claims Against SFREI") ¶ 109.

11. Our conclusion would be the same whether or not we accepted plaintiff's contention that under Missouri law, "defendants have the bur-

den of proving that they took the properties with no notice of the breaches of trust." *See* Plaintiff's Memorandum of Law Covering SFREI Liability and Duty of Restitution of July 17, 1986 at 22 and cases cited therein; *but see* Pretrial Order at Exh. C ("SFREI's Contentions with Respect to Disputed Factual Matters") ¶ 5 (alleging that plaintiff bears burden of proof on issue of defendant's constructive notice).

12. *See* Restatement (Second) of Trusts, § 297, Comment a—

"A third person has notice of a breach of trust not only when he knows of the breach, but also when he should know of it; that is when he knows facts which under the circumstances would lead a reasonably intelligent and diligent person *to inquire* whether the trustee is a trustee and whether he is committing a breach of trust, and if *such inquiry* when pursued with reasonable intelligence and diligence would give him knowledge or reason to know that the trustee is committing a breach of trust."

(Emphasis added). *See* also text *infra.*

whom he is dealing is or may be a trustee ...; (3) the character of the property dealt with, whether it is land or a chattel or a chose in action, negotiable or non-negotiable; (4) whether the transaction is one in the ordinary course of the business of the trustee; (5) whether the trustee is disposing of the property for much less than its real value; (6) whether the third person knows or has reason to believe that the trustee is dealing with the property for his own benefit; (7) whether the third person is purchasing the property or engaging in some other transaction with the trustee, as for example where he is making a payment or conveyance to the trustee ... or is acting as depository of trust funds ... or is a corporation registering a transfer of securities ... or is engaged in some other dealings with the trustee....

*Id.* (quoting Restatement (Second) of Trusts § 297, Comment a (1959)).

As defendants point out, factor 5 is absent as "this is not a case in which the disparity in price is so overwhelming and absence of legitimate business purpose so evident that knowledge of irregularity can reasonably be presumed." *Terrydale*, 611 F.Supp. at 1030–31 (citation omitted); *see also* Pretrial Order at Exh. 10B(ii) ("SFREI's Proposed Conclusions of Law Relating to Plaintiff's Claims Against SFREI") ¶ 121. In fact, Joseph Farber's testimony confirmed that even if the valuations were understated, they were not *so* understated as to inadvertently put any purchaser on notice. Rental, vacancy and operating expense rates within ten percent of those utilized by Farber, a margin of error he himself found acceptable, could lead to appraisal values closely approximating those obtained by TRT's original appraisers. *See* Tr. 1957; 1974. Farber also articulated that "there is room for question in every appraiser's interpretation of the marketplace" (Tr. 1882) and that it was judgment, neither competence nor method-

ology, which separated his own figures from those derived by Blain Chase and Van Court & Company. Tr. 1877, 1881; 1883–84. Finally, we already have determined that the market place was the best indicator of valuation and that it reflected the fairness of the price paid by SFREI. *Compare* instant case *with Rippey v. Denver United States National Bank*, 273 F.Supp. 718 (D.Colo.1967); *Estate of Rothko*, 84 Misc.2d 830, 379 N.Y.S.2d 923 (1975), *decree modified and otherwise aff'd*, 56 A.D.2d 499, 392 N.Y.S.2d 870, *aff'd*, 43 N.Y.2d 305, 401 N.Y.S.2d 449, 372 N.E.2d 291 (1977).

Defendants also note that "the TRT trustees were not dealing with the Denver principals for their own account (factor 6) ... and ... SFREI was negotiating 'an arm's length commercial transaction' in which [it] had 'an independent duty to obtain the most favorable terms' (Factor 7)." Pretrial Order at Exh. 10B(ii) ("SFREI's Proposed Conclusions of Law Relating to Plaintiff's Claims Against SFREI") ¶ 121; *see Terrydale*, 611 F.Supp. at 1030; 1032–33. Thus, the inquiry outlined by the Restatement (Second) of Trusts provides additional support for our conclusion that defendants should not be held to have known that the TRT trustees breached their fiduciary duty (if one assumes that said breach has been established).

### Conclusion

For the foregoing reasons, this Court finds that by voting for the transaction with SFREI and the liquidation plan, the TRT trustees breached neither TRT's Declaration of Trust nor the fiduciary duty they owed to the REIT's shareholders. Even if they had breached this duty, there would have been no basis upon which to conclude that the defendants should have known that such a breach had occurred and thus held to be constructive trustees of the subject properties.[13] In short, we conclude

---

**13.** Because of this conclusion, we need not determine certain issues raised by the parties at trial—*e.g.*, whether individual SFREI trustees should be dismissed as defendants; if SFREI

still had to pay for the value of the Lincoln Tower Building even though it was transferred pursuant to a 60–day option-to-purchase *and* SFREI made no profits on the sale.

that, lacking actual knowledge of any breach (*see* note 10 *supra* ), no circumstances existed here (*e.g.,* extreme undervaluation of assets) which would warrant imposition of liability as a constructive trustee. Complaint dismissed.

SO ORDERED.